UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KRISTA MOODY,

        Plaintiff,                            Case No. 1:21-cv-12485

v.                                          Honorable Thomas L. Ludington
                                               United States District Judge
MIDMICHIGAN MEDICAL CENTER
MIDLAND,

        Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In March 2020, the COVID-19 pandemic brought activities across the globe to a halt. In Michigan, as in many other states, hospitals cancelled elective surgeries in an effort to decrease COVID-19 infection rates and to ensure available rooms to treat patients with COVID-19. And in areas like Detroit, Michigan, a COVID-19 hotspot, hospitals were overwhelmed by patients with the virus and sought help from doctors and nurses who worked in areas where COVID-19 was not yet as prevalent.

Plaintiff Krista Moody, a Certified Registered Nurse Anesthetist, worked in Midland, Michigan, an area that—at that time—was not a COVID hotspot. So in late March 2020, she travelled to Southfield, Michigan—15 miles northwest of Detroit—to work a handful of shifts at a Providence Hospital. Upon her return, Plaintiff's employer, Defendant MidMichigan Medical Center Midland, cancelled her shifts because she had worked in a COVID-19 hotspot. Plaintiff alleges the cancellation of her shifts after she worked in Southfield was a violation of the ADA because Defendant perceived her as having COVID-19 and discriminated against her because of it. Defendant maintains Plaintiff's shifts were cancelled because of the fluid COVID-19 situation,

which decreased need for CRNAs throughout the pandemic. Plaintiff, who is still employed as a casual CRNA by Defendant, further alleges her work hours have been cancelled in retaliation for her opposition to discrimination under the ADA. The questions before this Court are whether Plaintiff has stated a prima facie case of discrimination and retaliation under the ADA.

I.

In July 2007, Plaintiff Krista Moody began working for Defendant MidMichigan Health as a full-time Certified Registered Nurse Anesthetist (CRNA). ECF No. 32-7 at PageID.532. After five years as a full-time CRNA, Plaintiff requested a "transfer" to a "casual CRNA" position after giving birth to her first child. *Id.* at PageID.533. In January 2013, Plaintiff began working as a casual CRNA. ECF No. 32-7 at PageID.533. Unlike full-time CRNAs, casual CRNAs do not have a set schedule and "are used to cover for full- or part-time employees during vacations, sickness, time-off, leave of absence or when a department requires additional staffing during periods of increased activity." ECF No. 34-5 at PageID.712. Between 2013 and 2020, Plaintiff's hours varied and she had "no guaranteed hours." ECF No. 32-7 at PageID.534.

In 2017 or 2018, *see* ECF No. 32-7 at PageID.536, Plaintiff began reporting to Scott Mango, Defendant's Director of Anesthesia and Surgical Services. ECF No. 32-7 at PageID.535–36. Mango is responsible for staffing CRNAs at all MidMichigan Health subsidiaries, ECF No. 32-6 at PageID.509–10, and is responsible for setting staff schedules. Mango testified that he considered a number of factors when building a staff schedule, including "the number of surgical rooms that needed to be run," the types of surgeries scheduled each day, and the scheduled surgery times to determine how many staff would be necessary. ECF No. 32-6 at PageID.512. Notably, Defendant's "Department of Nursing-Scheduling and staffing Policy with Procedure," notes that "scheduled overtime is allowed only as a last resort." ECF No. 34-5 at PageID.720. And the

"cancellation order" guidance Mango developed in collaboration with the nursing department in 2019, *see* ECF No. 32-6 at PageID.517, notes that CRNAs with scheduled overtime were to have their shifts cancelled before casual CRNAs, *id.* at PageID.524.

Then, in March 2020, the COVID-19 pandemic struck. In response to the pandemic, Michigan Governor Gretchen Whitmer declared a state of emergency. *See* Mich. Executive Order No. 2020-04 (Mar. 10, 2020).

Shortly after the start of the COVID-19 Pandemic, Plaintiff traveled to Southfield, Michigan to provide medical services at Providence Hospital four times: twice in late March, and twice in mid-April. ECF No. 32-7 at PageID.542. At the time, Southfield was a COVID-19 hotspot. *See* Mike Wilkinson & Riley Beggin, *Black communities hit harder by coronavirus in Michigan, not just Detroit*, BRIDGE MICH. (April 1, 2020), https://www.bridgemi.com/michigan-health-watch/black-communities-hit-harder-coronavirus-michigan-not-just-detroit (noting Southfield had the highest infection rate in Oakland County) [https://perma.cc/TL34-3LV5].

On March 26, 2020—the same day Plaintiff worked her first shift at Providence Hospital—Mango sent an email to all MidMichigan staff, including Plaintiff, in which he shared his "opinions" about things MidMichigan employees should "consider[]" if they decided to work at hospitals in COVID-19 hotspots. ECF No. 34-21 at PageID.779. The next day, Mango texted Plaintiff to inform her that he "need[ed] to cancel [her] on Saturday night" and that he "need[ed] to know" whether she had picked up any shifts "down south (Providence, Detroit, Oakland [C]ounty)." ECF No. 34-8 at PageID.728. Some time later, he texted Plaintiff again that he "never heard back" from her and needed to know if she had worked in a COVID-19 hotspot. *Id.* at PageID.729. He noted that Defendant was screening patients for surgery and that "providers were advised not to travel into hot spots." *Id.* He concluded that until he had heard back from Plaintiff

about whether she had worked in a COVID-19 hotspot, he would have to cancel Plaintiff's shifts "until [he] [knew] differently." *Id.*

Plaintiff did not respond to Mango by text message, but instead sent an email to him on March 28, 2020 in which she asserted that by cancelling her shifts because she worked in a COVID-19 hotspot, she was "being discriminated against and treated illegally." ECF No. 34-9 at PageID.731. She informed him that she was "seeking legal counsel for discrimination." *Id.* at PageID.732.

Plaintiff secured counsel and three weeks later, her attorney sent a letter to Defendant outlining how he believed the cancellation of Plaintiff's shifts violated state and federal laws and requested Defendant's "executives" to "present a plan to [Plaintiff] through [his] office as to how this situation can be remedied." ECF No. 34-16 at PageID.765. Throughout April 2020, Defendant cancelled the only three scheduled shifts Plaintiff had that month: April 16, 21, and 29. ECF Nos. 32-4 at PageID.463; 32-7 at PageID.551

In May 2020 Plaintiff's attorney contacted the *Midland Daily News*, a local newspaper, to explain why he believed that Defendant was discriminating against Plaintiff. *See* ECF No. 32-7 at PageID.554. Plaintiff provided comments to a *Midland Daily News* reporter and a story was published on May 14, 2020. Throughout the month of May, Defendant cancelled two of Plaintiff's shifts on May 6 and May 19, but Plaintiff worked four shifts on May 5, May 7, May 15, and May 21. ECF Nos. 32-4 at PageID.464; 32-7 at PageID.551–52. On May 29, 2020, the statewide ban on elective surgeries was lifted. *See* Mich. Executive Order No. 2020-96 (May 21, 2020).

On June 12, 2020, Plaintiff filed a formal complaint with the EEOC alleging disability discrimination in violation of the Americans with Disabilities Act. *See* ECF No. 34 at PageID.660. Six days later, her shift scheduled for June 18, 2023 was cancelled. ECF No. 32-4 at PageID.465.

Plaintiff, who is still employed as a casual CRNA by Defendant, alleges her shifts "suffer at the hands of Mango," as a result of retaliation for opposing and reporting the alleged discrimination, ECF No. 34 at PageID.676, despite Defendant's offer of full-time employment to her in July 2020, *see* ECF No. 32-8 at PageID.599. Accordingly, she filed an amended EEOC complaint in January 2021 adding a claim of retaliation in violation of the ADA. ECF No. 34 at PageID.662.

In July 2021, the EEOC concluded, after investigating, that there was "insufficient evidence" to establish that Plaintiff was laid off in March 2020 because Defendant regarded her as disabled under the ADA, but that there was "reasonable cause to believe" that Defendant denied Plaintiff "scheduled shifts while hiring others in the same title" because Defendant regarded Plaintiff as disabled and in retaliation for "complaining about her rights under the ADA." ECF No. 34-20 at PageID.776–77.

Three months later, Plaintiff filed a complaint in this Court against Defendant alleging violations of the ADA and Title VII. ECF No. 1 at PageID.3. She alleged Defendant discriminated against her by cancelling her shifts after she worked in Southfield because Defendant regarded her as having COVID-19 and because she associated with African American patients. *Id.* at PageID.3–5. Plaintiff further alleged that after learning of her EEOC complaint, Defendant retaliated by cancelling more of her shifts. *Id.* at PageID.5. Defendant filed a Motion to Dismiss, ECF No. 6, which was granted in part to the extent that Plaintiff's Title VII associational-discrimination claim was dismissed. ECF No. 14. Eleven days later, Plaintiff filed an Amended Complaint. ECF No. 16.

Importantly, Plaintiff's Amended Complaint appears to concede that "[f]or the time period between late March 2020 and early May 2020[,] the Defendant's hospital suspended elective surgeries at its facility due to the State of Michigan's emergency orders." ECF No. 16 at

PageID.235. As a result, "the cancellation of the elective surgeries for that time period reduced the Defendant's need for CRNA services; therefore, the Defendant's need for Plaintiff's services during that period was limited." *Id.* Plaintiff alleges that, "starting in early to mid-May 2020, Defendant began conducting elective surgeries again," and the "need" for CRNAs increased, but "[d]espite this increased need, Plaintiff's scheduled shifts were being cancelled on a regular basis." *Id.* at PageID.236. In this way, Plaintiff admits that although she engaged in her first protected activity in April 2020, Defendant's explanation for cancelling her shifts in April and May 2020—that it's pandemic-era operational needs—was legitimate. *See also* ECF Nos. 32-7 at PageID.535 (noting approximately 75% of Plaintiff's work involved providing services for elective surgeries), PageID.539 (admitting that in March 2020, the postponement of elective surgeries significantly impacted the amount of work available for all CRNAs); ECF No. 32-6 at PageID.520–21 (noting that the scheduling of CRNAs was "very significantly" impacted by the ban on elective surgeries).

Defendant now seeks summary judgment, arguing Plaintiff cannot establish a *prima facie* case for either of her remaining claims. ECF No. 32.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the initial burden of "identifying" evidence in the record "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). A genuine issue of fact requires more than "a mere scintilla of evidence," *id.* at

251, and more than "some metaphysical doubt," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The court must draw all reasonable inferences in favor of the nonmovant to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Summary judgment will be granted if the nonmovant fails to establish a genuine issue of material fact on the elements of its case that the moving party has challenged. *See Celotex Corp.*, 477 U.S. at 322. But summary judgment will be denied if the challenged elements have "genuine factual issues that . . . may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

### III.

Plaintiff brings two claims under the ADA—a discrimination claim and a retaliation claim. ECF No. 16. According to Defendant, both claims should be dismissed because "[n]either are supported in fact or by controlling law." ECF No. 32 at PageID.411. Each claim will be discussed below.

#### A. ADA Discrimination

Plaintiff first claims that she was discriminated against when her shifts were cancelled in March 2020 because Defendant regarded her as having a disability—COVID-19—after working in Southfield. ECF No. 16 at PageID.234–35.

#### 1.

Under the ADA employers are prohibited from discriminating against employees "on the basis of disability." 42 U.S.C. § 12112(a). "[D]isability" is defined as either (1) "a physical or

mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment." *Id.* § 12102(1).

A person is "regarded as having such an impairment" if they demonstrate that they have been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity. *Id.* § 12102(3)(A). But a person cannot bring a regarded-as claim under the ADA for a "transitory and minor" impairment. *Id.* § 12102(3)(B).

**2.**

Defendant argues that Plaintiff "cannot establish that Mango perceived her as having COVID-19" or as being disabled under the ADA. ECF No. 32 at PageID.414. Plaintiff responds that "Mango regarded anyone that worked in the Detroit-area as having COVID-19" and points to the March 26, 2020, email Mango sent about "working elsewhere" to support that conclusory statement. ECF No. 34 at PageID.667–68.

But the email did not establish that Mango regarded anyone that worked in the metropolitan Detroit area as having COVID-19. The email outlined Mango's "**opinion**" regarding what things employees should "consider" when deciding whether to "work[] elsewhere." ECF No. 32-6 at PageID.523 (emphasis in original).

And even if Defendant *did* regard Plaintiff as having COVID-19, an initial COVID-19 diagnosis, without more, does not rise to the level of impairment necessary to bring a regarded-as ADA claim because COVID-19 is usually transitory and minor. *See Southall v Ford Motor Co.*, 645 F Supp 3d 826, 835 (S.D. Ohio, 2022) ("[W]ithout additional factual allegations about a person's particular experience with COVID, the disease is a 'transitory impairment' as that term is defined by [the ADA].").

In sum, there is no evidence that Mango—or anyone else—regarded Plaintiff as having COVID-19. And even if there was, COVID-19 is a "transitory and minor" impairment that is not covered by the ADA. 42 U.S.C. § 12102(3)(B). So Defendant's Motion for Summary Judgment will be granted with respect to Plaintiff's ADA discrimination claim, which will be dismissed with prejudice.

### B. ADA Retaliation

Plaintiff next claims that she was retaliated against by Defendant for opposing Defendant's actions, which she believes to violate the ADA. ECF No. 16 at PageID.235–37.

**1.**

The ADA prohibits retaliation against someone who "has opposed any act or practice made unlawful by [the ADA]" or who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" according to the ADA. 42 U.S.C. § 12203(a). To establish a *prima facie* case of retaliation under the ADA, the plaintiff must show that (1) they engaged in an activity protected under the ADA; (2) the defendant knew of that activity; (3) the defendant took an adverse action against that employee; and (4) there was a causal connection between the protected activity and the adverse action. *Rarrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

Under the ADA, "[p]rotected activity" includes "opposition" to unlawful employment discrimination and "participation" in investigations or proceedings involving unlawful discrimination. *Skrine v. Barrett Paving Materials*, 2015 WL 5214636, *13 (E.D. Mich. Sep. 4, 2015). Unlike the participation clause, "[t]he opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and informal

protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citation omitted).

**2.**

Defendant does not challenge that Plaintiff has established the first two elements: that Plaintiff engaged in a protected activity under the ADA and that Defendant knew of the activity. *See generally* ECF No. 32. But Defendant challenges the last two elements, arguing that it did not take adverse action against Plaintiff and, even if it did, there is no casual connection between protected activity and the alleged adverse employment action. ECF No. 32 at PageID.419–21. Each element will be discussed in turn.

**i.**

Although the parties do not dispute that Plaintiff engaged in protected activity, each alleged protected activity will be discussed below to address *when* Plaintiff first engaged in a protected activity for the purposes of analyzing causation and pretext.

Plaintiff identifies four alleged protected activities: (1) her March 28, 2020 email to Mango; (2) the April 17, 2020 complaint letter sent to Defendant by Plaintiff's attorney; (3) the May 14, 2020 *Midland Daily News* "article written about her case"; and (4) the June 12, 2020 filing of the formal EEOC charge. ECF No. 34 at PageID.674. The first three activities fall under the "opposition" clause of the ADA, and the fourth activity falls under the "participation" clause. *See* 42 U.S.C. § 12203(a).

Plaintiff's March 28, 2020 email to Mango—in which Plaintiff generally asserts she is "being discriminated against and treated illegally"—is not a protected activity under the opposition clause of the ADA. ECF No. 34-9 at PageID.731. Plaintiff's March 28 email to Mango lodges a variety of accusations about Defendant and Mango "trying to make an example of [Plaintiff]" by

"suspend[ing her] without pay" because she "did something that most people in Southfield call brave, selfless[,] and heroic." *Id.* at PageID.732. But at no point in the lengthy email does Plaintiff assert she is being discriminated against *because* she has a disability or *because* Defendant perceives her as having a disability. *See id.* Instead, Plaintiff's March 28 email is best classified as a "vague charge of discrimination" that does not rise to the level of a protected activity under the ADA. *Stevens v. Saint Elizabeth Med. Ctr., Inc.,* 533 F. App'x 624, 631 (6th Cir.2013); *see also Robinson v. MGM Grand Detroit, LLC,* No. 17-CV-13128, 2019 WL 2448331, at *6 (E.D. Mich. June 12, 2019), *aff'd*, 821 F. App'x 522 (6th Cir. 2020) (holding a plaintiff's letter to his employer that did not specifically allege *disability discrimination* is not protected activity under the ADA).

But Plaintiff's Attorney's April 17, 2020 letter to Defendant is protected activity under the opposition clause, as it complains about what Plaintiff believed to be unlawful discrimination with specificity and requests "a plan" for remedying the "situation." ECF No. 34-16 at PageID.765. Plaintiff's Attorney's letter to Defendant asserted that Defendant's cancellation of Plaintiff's shifts after "her selfless service in the Detroit area" was "a great moral failure on the part of [Defendant]" and a "violation of several state and federal laws," including "Michigan's Persons with Disabilities Civil Rights Act and the federal Americans with Disabilities Act." *Id.* The specific accusations in this letter are protected activity. *See Sharp v. Waste Mgmt., Inc.*, 47 F. Supp. 3d 584, 601 (S.D. Ohio 2014), *aff'd sub nom. Sharp v. Profitt,* 674 F. App'x 440 (6th Cir. 2016) ("A letter to an employer constitutes protected activity if it opposes unlawful activity with some specificity, as opposed to merely a 'vague charge of discrimination.'" (quoting *Stevens v. Saint Elizabeth Med. Ctr., Inc.,* 533 F. App'x 624, 631 (6th Cir.2013))).

The May 14, 2020 *Midland Daily News* "article written about her case" is not, however, a protected activity. ECF No. 34 at PageID.674. The article, written by a journalist, is not a statement

of opposition by Plaintiff, and merely reports the claims made within her forthcoming EEOC complaint. And though statements Plaintiff makes to a newspaper *may be* protected activity in some circumstances, *the article itself*, as Plaintiff alleges here, is not protected activity when it is written by someone other than the Plaintiff. *See Johnson v. Univ. of Cincinnati, 215 F.3d 561, 580 (6th Cir. 2000)* (noting that, in the Title VII retaliation context, "there is no qualification on . . . the party to whom the complaint is made known," and it may include "management, unions, other employees, or newspapers"); *see also Reeder v Cnty. of Wayne*, 177 F Supp 3d 1059, 1081 (E.D. Mich, 2016) (noting ADA and Title VII retaliation claims are evaluated under the same framework (citing *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997)).

Finally, Plaintiff's June 12, 2020 EEOC complaint is also a protected activity under the ADA's participation clause. *See Evans v. Memphis Light, Gas, & Water Div.*, No. 06-2037, 2007 WL 9710064, at *8 (W.D. Tenn. Dec. 20, 2007) (*"*[I]t is well-established that the filing of an EEOC complaint is protected activity under the ADA." (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 717 (6th Cir. 2007))).

### ii.

Turning to the second element of ADA retaliation, Defendant knew of Plaintiff's protected activity sometime in April 2020 when it received the April 17, 2020 letter from Plaintiff's Attorney. *See* ECF Nos. 32 at PageID.410–11; ECF No. 32-16. And Mango stated in his deposition testimony that he became aware of Plaintiff's protected activity—her participation in filing an EEOC complaint—by reading the May 14, 2020 *Midland Daily News* article, *see* ECF No. 32-6 at PageID.516. Thus, there is no question of material fact that Defendant and Mango knew of Plaintiff's protected activity and the second element is satisfied.

### iii.

The third element of ADA retaliation, whether Defendant took an adverse employment action against Plaintiff, is also satisfied. Plaintiff alleges Defendant took adverse employment action by cancelling her shifts. ECF No. 34. Defendant asserts Plaintiff did not suffer an adverse employment action because she was a casual CRNA, so her hours often fluctuated. *See* ECF No. 32 at PageID.415–16, 420. True, Plaintiff is a casual-status employee, so her hours were irregular. But the *irregularity* of Plaintiff's scheduled shifts *before* her protected activities does not explain the *cancellation* of her scheduled shifts *after* her protected activities. *See Eischen v Monday Cmty. Corr. Inst.*, No. 3:14-CV-48, 2015 WL 4512482, at *5 (SD Ohio, July 24, 2015) (finding a genuine dispute of material fact as to whether Plaintiff suffered an adverse employment action to deny summary judgement where Plaintiff "did not have a guaranteed number of hours in the first place" but her hours were reduced after she engaged in protected activity). And, importantly, "[i]n the context of retaliation, [] a plaintiff need only show that 'the employer's actions (are) harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Pettway v. Logistics Sols. Grp., Inc.*, No. 3:17-CV-73-DJH-CHL, 2020 WL 981712, at *18 (W.D. Ky. Feb. 28, 2020) (quoting *White v. Coventry Health & Life Ins. Co.,* No. 3:14-CV-00645-CRS, 2015 WL 6680908, at *10 (W.D. Ky. Nov. 2, 2015), *aff'd*, 680 F. App'x 410 (6th Cir. 2017)). The frequent cancellation of *scheduled shifts* after opposing what Plaintiff believed to be discrimination "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* And this is true even though Plaintiff was still permitted to work *some* shifts, as the result was an overall reduction in her work hours. *See Pettway v Logistics Sols. Group, Inc*, No. 3:17-CV-73-DJH-CHL, 2020 WL 981712, at *18 (WD Ky, February 28, 2020) (finding plaintiff suffered adverse employment action when his hours were reduced after engaging

in protected activity); *Herron v. DeJoy*, No. 218CV02862JTFCGC, 2021 WL 4859395, at *5 (W.D. Tenn, July 29, 2021), *report and recommendation adopted sub nom. Herron v Brennan*, No. 218CV02862JTFCGC, 2021 WL 4849516 (W.D. Tenn, October 18, 2021) (holding "overall reduction in work hours per week alone is sufficient to constitute an adverse employment action.").

In sum, Defendant took adverse employment action against Plaintiff by cancelling even *some* of her shifts.

**iv.**

Lastly, Defendant argues Plaintiff cannot establish a causal connection between the protected activity and the adverse employment action because there is no evidence of "retaliatory intent." ECF No. 32 at PageID.421. Plaintiff, on the other hand, argues that temporal proximity between her protected activity and the cancellation of her shifts alone is enough because the time between Plaintiff's protected activity and the cancellation of her shifts was so short. ECF No. 34 at PageID.676.

The Sixth Circuit has not developed consistent precedent regarding "whether temporal proximity alone can suffice to show causation for purposes of a retaliation claim—and if so, how close in time the adverse action must be." *Nesco Res LLC v Reid*, No. 3:20-CV-768-DJH-RSE, 2022 WL 18639039, at *2 (WD Ky, February 25, 2022); *see also Stein v Atlas Indus., Inc*, 730 F. App'x 313, 319 (6th Cir. 2018) ("Our cases indicate that the line should be drawn shy of the ten-week mark."; *but see Kenney v Aspen Techs., Inc*, 965 F3d 443, 449 (6th Cir. 2020) (holding a two-and-a-half month lapse in time between protected activity and adverse employment action "is not, standing alone, a convincing case for proving causation.") (citing *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 324, 401 (6th Cir. 2010)).

Although Plaintiff's shifts were cancelled on April 16, 21, and 29, 2020, *see* ECF No. 32-7 at PageID.551, and May 6 and 18, 2020, *see* ECF No. 32-4 at PageID.464, these cancellations will not be considered because Plaintiff's Amended Complaint admits that the reason for these cancellations was the elective-surgery ban. *See supra* Part I.

Plaintiff's first shift cancelled after the lift of the elective-surgery ban was June 18, 2020. *See* ECF No. 32-4 at PageID.465. True, this was 62 days after Defendant first became aware of Plaintiff's opposition through her attorney's letter. Such a timeframe *might* suggest something more is needed to prove causation. But it was only 35 days after the *Midland Daily News* article was published—which was when Mango asserts he became aware of Plaintiff's intent to file an EEOC complaint—and only six days after she officially filed her EEOC complaint. These short timeframes fall into the bucket of cases where the Sixth Circuit has found temporal proximity alone is enough to establish causation. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 427 (6th Cir. 2021) (finding a "one- to two-month time lapse between the protected activities and the adverse actions suffices to establish a genuine issue as to causation"); *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 664 (6th Cir. 2020) (explaining that an adverse employment action "just a few months" after learning of a plaintiff's protected activity is sufficient to establish causal connection on temporal proximity alone); *Stein v Atlas Indus, Inc*, 730 F. App'x 313, 319 (6th Cir. 2018) ("Our cases indicate that the line should be drawn shy of the ten-week mark."); *cf. Doe v. City of Detroit, Michigan*, 3 F.4th 294, 304 (6th Cir. 2021) (finding temporal proximity alone not sufficient to establish causation where "more than five months had passed" between protected activity and adverse employment action); *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) (concluding "a roughly 75-day delay between [plaintiff's] protected activity and an adverse employment action is not, standing alone, a convincing case for proving

causation"). Thus, Plaintiff has satisfied the causation element by temporal proximity alone, to survive summary judgment.

v.

Where, as here, a plaintiff "makes out a prima facie case of retaliation, the burden shifts to the employer to produce evidence of a legitimate, nonretaliatory reason for its actions." *Dulaney v. Flex Films (USA), Inc.*, No. 20-6098, 2021 WL 3719358, at *6 (6th Cir. Aug. 23, 2021) (citing *Niswander*, 529 F.3d at 720). If the employer offers such evidence, the burden shifts back to the plaintiff to "demonstrate that the employer's proffered nonretaliatory reason for its actions was in fact only pretext for retaliatory conduct." *Id.*

"Pretext is simply an inquiry about causation" addressing whether the decisionmaker acted with retaliatory motive. *Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204, 210 (6th Cir. 2021). A plaintiff may establish pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). These categories "marshal[ ] evidence and focus[ ] it on the ultimate inquiry," which is "whether the employer made up its stated reason to conceal intentional [retaliation]." *Id.* (third alteration in original) (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009)). In sum, "summary judgment is proper" on pretext grounds "if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." *Chen*, 580 F.3d at 400 n. 4 (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)).

Defendant argues that it cancelled each of Plaintiff's shifts because of its pandemic-era "operational needs," which were impacted by elective-surgery bans and travel bans that meant

regularly-scheduled CRNAs were "no longer taking time off." ECF No. 32 at PageID.442–43. And, as discussed, Plaintiff concedes that the elective-surgery ban throughout April and May 2020 explains her cancelled shifts during that time period. *See supra* Part I*; see also* ECF No. 16 at PageID.235–36. Thus, there is no genuine issue of material fact that Defendant's proffered nonretaliatory business reason for cancelling Plaintiff's shifts during the elective-surgery ban was not pretextual. Indeed, Plaintiff concedes this point. *See* ECF Nos. 32-7 at PageID.535 (noting approximately 75% of Plaintiff's work involved providing services for elective surgeries), 539 (admitting that, in March 2020, the postponement of elective surgeries significantly impacted the amount of work available for all CRNAs). In sum, "a jury could not reasonably doubt the employer's explanation" for cancelling Plaintiff's shifts during the elective-surgery ban. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)).

But there are questions of fact as to whether Defendant's proffered nonretaliatory business reason—its pandemic-era "operational needs"—was based in fact *after* the ban on elective surgeries was lifted on May 29, 2020. Defendant makes much of the fact that Mango "asked and discussed with [Plaintiff] opportunities to be hired as a regular full-time employee" in July 2020.[1] *See* ECF No. 32-8 at PageID.599. This certainly suggests the cancellation of shifts due to pandemic-era operational needs was not pretext, as it suggests Defendant wanted Plaintiff to work *more* shifts. ECF Nos. 32-7 at PageID.558; 32-8 at PageID.599. But, on the other hand, Mango's

---

[1] Though Defendant's offer of full-time employment to Plaintiff in July 2020 may not be dispositive in the context of the retaliation analysis, if a jury finds Defendant liable, the July 2020 offer of employment would be a notable fact in the jury's evaluation of whether Plaintiff mitigated her damages, as would her ongoing employment as a CRNA with at least five other hospitals or surgical centers. *See* ECF No. 32-7 at PageID.559. *See also Gunter v. Bemis Co., Inc.*, 906 F.3d 484, 490 (6th Cir. 2018) ("The [ADA] requires an employee to use reasonable diligence to mitigate damages.").

cancellation of Plaintiff's shifts in favor of full-time staff violated Defendant's scheduling policy, which does suggest pretext. *See* ECF No. 34-5 at PageID.720 ("Scheduled overtime is allowed only as a last resort. [. . .] Awarding shifts to casual/part time employees will be done first, followed by full time staff so as to decrease overtime."); *see also Kovacevic v. Am. Int'l Foods*, No. 22-1675, 2023 WL 3756063, at *7 (6th Cir. June 1, 2023) ("[A] company's failure to follow [an articulated] practice may be evidence of pretext." (citing *DeBoer v. Musashi Auto Parts, Inc.*, 124 F.App'x 387, 394–95 (6th Cir. 2005))); *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 89 (6th Cir. 2020) (Clay, J., dissenting) ("[T]he burden is on Defendants to explain why they departed from their own policy.").

In sum, there is a question of material fact regarding whether Defendant's proffered legitimate nonretaliatory business reason had a basis in fact *after* the elective-surgery ban was lifted on May 29, 2020, so Defendant's Motion for Summary Judgment will be denied as it relates to Plaintiff's claim of ADA Retaliation (Count II). Plaintiff's ADA retaliation claim will proceed to jury trial, but the jury will be instructed that Defendant's cancellation of Plaintiff's shifts from April 17, 2020—the date Plaintiff first engaged in protected activity—through May 29, 2020 was because of the statewide ban on elective surgeries that was in effect.

## IV.

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 32, is **GRANTED IN PART** to the extent it seeks dismissal of Plaintiff's ADA discrimination claim.

Further, it is **ORDERED** that Plaintiff's ADA discrimination claim, Count I, is **DISMISSED WITH PREJUDICE**.

Further, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 32, is **DENIED IN PART** to the extent it seeks dismissal of Plaintiff's ADA-retaliation claim.

**This is not a final order and does not close the above-captioned case.**

Dated: December 4, 2023                    s/Thomas L. Ludington
                                           THOMAS L. LUDINGTON
                                           United States District Judge